O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHRISTOPHER CARREA, JR., | ) | NO. EDCV 07-1148-CAS (MAN) |
| | ) | |
| Plaintiff, | ) | MEMORANDUM AND ORDER DISMISSING |
| | ) | |
| v. | ) | FIRST AMENDED COMPLAINT WITH LEAVE |
| | ) | |
| | ) | TO AMEND |
| STATE OF CALIFORNIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, a state prisoner proceeding *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 in this Court on September 11, 2007 ("Complaint").[1]

On December 19, 2007, the Court issued a memorandum and order dismissing the Complaint, with leave to amend, pursuant to the screening provisions of the Prison Litigation Reform Act of 1995 ("PLRA"). On

---

[1]   Plaintiff initially filed his Complaint in the San Francisco Superior Court. One of the defendants, the California Department of Corrections and Rehabilitation ("CDCR"), was served with process and removed the action, pursuant to 28 U.S.C. § 1441(b), to the United States District Court for the Northern District of California, which thereafter transferred the action to this Court.

1    March 6, 2008, plaintiff filed a First Amended Complaint.

2

3        Congress has mandated that courts perform an initial screening of
4    prisoner civil rights actions.  This Court may dismiss a prisoner civil
5    rights action before service of process if it concludes that the
6    complaint is frivolous, fails to state a claim, or seeks relief against
7    a defendant who is immune from suit.[2]  28 U.S.C. § 1915A(b); 42 U.S.C.
8    § 1997e(c)(1).

9

10       In screening a *pro se* complaint, the Court must construe it
11   liberally and must afford plaintiff the benefit of any doubt.  Karim-
12   Panahi v. Los Angeles Police Dep't., 839 F.2d 621, 623 (9th Cir. 1988).
13   Leave to amend should be granted if it appears at all possible that
14   plaintiff can correct the defects of his complaint.  Lopez v. Smith, 203
15   F.3d 1122, 1130 (9th Cir. 2000); *see also* Karim-Panahi, 839 F. 2d at 623
16   (*pro se* litigant must be given leave to amend complaint unless it is
17   absolutely clear that its deficiencies cannot be cured by amendment);
18   Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir. 1987)(same).

19

20

21       [2]    In general, courts screen complaints pursuant to 28 U.S.C. §
22   1915A prior to service of process.  Here, plaintiff has already served
     one of the defendants, the CDCR, with process.  However, the statute
23   provides that "[t]he court shall review" the complaint "before
     docketing, if feasible or, in any event, as soon as practicable after
24   docketing."  Here, screening of the complaint was "practicable" only
     after the CDCR was served and removed the action to federal court.
25   *See* Ruston v. Dallas County, 2008 WL 958076, *2 (N.D. Tex., April 9, 2008)
26   (Section 1915A screening applies to prisoner actions removed from state
     court); Morris v. Horel, 2008 WL 686874, *1 (N.D. Cal., March 12,
27   2008)(screening civil rights action removed from state court pursuant
     to Section 1915A).  Thus, the Court will screen the claims against the
28   CDCR as well as against the other defendants.

1

**ALLEGATIONS OF THE FIRST AMENDED COMPLAINT**

2

3   The First Amended Complaint, consisting of 274 pages,[3] asserts
4   claims arising out of plaintiff's incarceration at the California
5   Institution for Men at Chino ("CIM").  Defendants are:  (1) the State
6   of California;[4] (2) Governor Arnold Schwarzenegger; (3) the CDCR; (4)
7   James Tilton, Secretary of the CDCR; (5) Jeanne Woodford, former
8   Director of the CDCR; (6) CIM Warden Poulos; (7) Dr. Yee; (8) Riverside
9   County Regional Medical Center ("RCRMC"); (9) Renaissance Radiology
10  Medical Group ("Radiology Group"); (10) Dr. Lyle Roper; and (11) Dr.
11  Minsley.  The Court will refer to the CDCR, Secretary Tilton, Director
12  Woodford, and Warden Poulos, collectively, as the "CDCR defendants."

13

14  Plaintiff complains that Governor Schwarzenegger and the CDCR
15  defendants allowed the CDCR to take custody of him, despite knowing that
16  the California prison system is overcrowded and unable to provide
17  adequate medical care, and then placed him in an old and dilapidated
18  facility that was designed to house only a fraction of the inmates

19

_____

20      [3]   The excessive length of the First Amended Complaint is largely
21  due to plaintiff's repetition of the same allegations in each claim.
    If plaintiff files a Second Amended Complaint, he should number the
22  paragraphs and then incorporate allegations by reference yo earlier
    paragraph numbers as needed.  Plaintiff should keep in mind the mandate
23  of Rule 8(a) of the Federal Rules of Civil Procedure to set forth a
    "*short* and plain statement of the claim." Fed. R. Civ. P. 8(a)(*emphasis*
24  *added*).  The contents of the First Amended Complaint do not justify its
    length.
25

26      [4]   Plaintiff named the State of California as a defendant in the
    original Complaint, but it is not entirely clear from the First Amended
27  Complaint whether he intends to retain it as defendant.  If plaintiff
    deletes any defendants in the Second Amended Complaint, he should omit
28  them from the caption.

1   currently housed there.

2

3        According to plaintiff, CIM housing officers follow a practice of

4   deliberately placing a small number of older black inmates in

5   dormitories with a larger number of young Hispanic inmates, while

6   placing the young black inmates in single cells.  Plaintiff contends

7   that the prison officials making these assignments know that the older

8   black inmates placed in dormitories will be assaulted by the younger and

9   more numerous Hispanic inmates.  He asserts that Governor Schwarzenegger

10  and the CDCR defendants are aware of the attacks on the black inmates,

11  because prison officials testified regarding racial violence in

12  California prisons during the lower court proceedings in Johnson v.

13  California, 543 U.S. 499, 125 S. Ct. 1141 (2005).[5]

14

15       In May 2006, plaintiff was placed in a dormitory where black

16  inmates were outnumbered by Hispanic inmates five to one, and he was

17  attacked four times during a ten-day period.  The average age of the

18  black inmates in the dormitory was 45 and the average age of the

19  Hispanic inmates was 24.  Plaintiff himself is over 50.

20

21       Plaintiff and seven other black inmates were marched into the

22  dormitory past Warden Poulos, the Assistant Warden, and 20 officers.

23  According to plaintiff, Warden Poulos and the other prison officials

24  knew the assault would take place and waited for it to occur.  They did

25  ─────────────────────

26       [5]    In Johnson, the Supreme Court held that the strict scrutiny
    standard of review applied to determine whether California's policy of
27  housing new or transferred inmates with cellmates of the same race
    during initial evaluation violated the Equal Protection Clause.  543
28  U.S. at 515, 125 S. Ct. at 1152.

4

1  not do anything to stop the assault.

2

3      As a result of the assault, plaintiff lost consciousness, one of

4  his teeth was knocked into his nasal cavity, and he required

5  hospitalization and stitches.  Defendants Dr. Yee and Dr. Minsley did

6  not diagnose the problem correctly and did not provide stabilization

7  treatment.  Instead, they gave him medication that caused him to lose

8  consciousness again.  Prison officials then took him to the RCRMC, where

9  medical staff misdiagnosed his problem as a sinus infection and provided

10  him with sinus medication instead of removing the tooth stuck in his

11  nasal cavity and providing him with antibiotics.  He received an x-ray,

12  but Dr. Roper at the Radiology Group misread the results.

13

14      Plaintiff alleges that Governor Schwarzenegger and the CDCR

15  defendants are aware of the inadequacies of prison  medical care,

16  because of the findings made by United States District Judge Thelton E.

17  Henderson in the class action, Plata v. Schwarzenegger (CV 01-1351),

18  pending in the Northern District of California.  He argues that, because

19  of their knowledge of these deficiencies, defendants knew that plaintiff

20  would have a high probability of receiving inadequate medical treatment.

21

22      When plaintiff was released from the hospital, he was placed in

23  segregation, where he was not provided with his prescribed pain

24  medication.  Prison officials charged plaintiff with participating in

25  a riot, despite the fact that all the correctional officers who

26  witnessed the incident stated that he was a victim.  Despite the lack

27  of evidence that plaintiff assaulted anyone, he was convicted of a

28  disciplinary offense.  Plaintiff contends that he was convicted on

1 account of his race.

2

3       The associate warden refused to approve plaintiff's disciplinary
4 conviction and dismissed the charges against him.   However, the
5 institution erroneously failed to release him, and he was held in
6 segregation for a total of 120 days.   Plaintiff complains that, apart
7 from this erroneous detention, he was improperly sent to prison on two
8 prior occasions, once for four hours and once for a day.   On both
9 occasions, prison officials acknowledged that his detention was
10 erroneous and released him, but plaintiff contends that this type of
11 repeated error has never happened to anyone else and would never happen
12 to a white inmate.

13

14       Plaintiff alleges that there was no air conditioning or ventilation
15 in the "hole," and the summer heat was such that even the concrete walls
16 felt hot.   The toilet was broken and leaked during the entire 120-day
17 period, and there were leeches on the floor.

18

19       Plaintiff asserts claims under 42 U.S.C. § 1981 and 42 U.S.C. §
20 1983 against the State of California, Governor Schwarzenegger, and the
21 CDCR defendants, and solely under 42 U.S.C. § 1983 against the RCRMC,
22 the Radiology Group, and Drs. Minsley, Yee, and Roper.[6]   He seeks
23 general damages of $20 million, "specific" damages of $20 million, and

24

25       [6]   In the caption of the First Amended Complaint, plaintiff
refers to claims under 42 U.S.C. § 1985, 42 U.S.C. § 1986, 42 U.S.C. §
26 1395, and pendent state claims.   However, the Court has found no such
claims in the body of the pleading.   In any event, the Court identified
27 the deficiencies of plaintiff's Section 1985 and 1986 claims in its
prior dismissal order, and Section 1395 pertains to the Medicare program
28 and has no applicability whatsoever to this action.

1  punitive damages of $50 million.

2

3                              **DISCUSSION**

4

5  **I.   PLAINTIFF CANNOT PURSUE CLAIMS FOR DAMAGES AGAINST THE STATE OF**

6      **CALIFORNIA AND THE CDCR.**

7

8       Plaintiff has named as a defendant the State of California and the

9  CDCR, a state agency.  (First Amended Complaint at p. 1.)

10

11      The Eleventh Amendment prohibits federal jurisdiction over claims

12  brought against a state and its agencies unless the state consents to

13  suit.  Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100,

14  104 S. Ct. 900, 908 (1984).  The State of California has not consented

15  to be sued for civil rights violations in federal court, nor has

16  Congress abrogated state immunity against Section 1983 suits.  BV

17  Engineering v. Univ. of Cal., Los Angeles, 858 F.2d 1394, 1396 (9th Cir.

18  1988); see also Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241,

19  105 S. Ct. 3142, 3146 (1985).  Plaintiff's claims against the State of

20  California, therefore, are barred by the Eleventh Amendment.

21

22      Moreover, neither the State of California nor the CDCR are

23  "persons" within the meaning of Section 1983.  Will v. Michigan Dept.

24  of State Police, 491 U.S. 58, 64, 109 S. Ct. 2304, 2308-09 (1989)(a

25  state is not a "person" under Section 1983); Allison v. California Adult

26  Authority, 419 F.2d 822, 823 (9th Cir. 1969) (California Adult Authority

27  is not a person within meaning of Civil Rights Act); Bennett v.

28  California, 406 F.2d 36, 39 (9th Cir. 1969) (the California Department

of Corrections is not a person within the meaning of Civil Rights Act).
Although a state and its agencies may waive their Eleventh Amendment
immunity (at least as to state law claims) by removing an action to
federal court, as the CDCR has done here, a state agency such as the
CDCR is not a "person" under Section 1983, regardless of whether it has
removed Section 1983 claims to federal court. *See* Lapides v. Board of
Regents of University System of Georgia, 535 U.S. 613, 617–18, 624, 122
S. Ct. 1640, 1642, 1646 (2002); Bank of Lake Tahoe v. Bank of America,
318 F.3d 914, 917–18 (9th Cir. 2003).  Section 1981 also does not create
a cause of action against a state or a state agency.  Pittman v. Oregon,
Employment Dept., 509 F.3d 1065, 1074 (9th Cir. 2007).  Thus, plaintiff
cannot pursue claims for damages against the CDCR under Section 1983 or
Section 1981.

Accordingly, plaintiff's claims against the State of California and
the CDCR must be dismissed.

## II.   **PLAINTIFF FAILS TO STATE A SECTION 1981 CLAIM AGAINST ANY DEFENDANT**.

Plaintiff has asserted claims under Section 1981 against Governor
Schwarzenegger and the CDCR defendants.

Section 1981 provides, in pertinent part, that all persons shall
have the same right "to make and enforce contracts, to sue, be parties,
give evidence, and to the full and equal benefit of all laws and
proceedings for the security of persons and property as is enjoyed by

white citizens." 42 U.S.C. § 1981.[7] However, "Section 1981 is not 'a general proscription of racial discrimination . . . it expressly prohibits discrimination only in the making and enforcement of contracts.'" Peterson v. State of California Dept. of Corrections and Rehabilitation, 451 F. Supp. 2d 1092 (E.D. Cal. 2006)(*quoting* Patterson v. McLean Credit Union, 491 U.S. 164, 176, 109 S. Ct. 2363, 2372 (1989)). Although, in an attempt to broaden the Patterson reading of the term "make and enforce contracts," Congress amended Section 1981, in 1991, to include subsection (b), which defines that phrase, this amendment only brought conduct occurring after the formation of a contract, including discriminatory termination, within the scope of Section 1981. Domino's Pizza v. McDonald, 546 U.S. 470, 477, 126 S. Ct.

---

[7]    In its entirety, Section 1981 reads as follows:

a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

1246, 1250 (2006).   The Supreme Court has explained that, in amending the statute, Congress not only "let stand <u>Patterson</u>'s focus upon contract obligations," but also "positively reinforced that element by including in the new § 1981(b) reference to a 'contractual relationship.'"   *Id.*   Thus, "a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce'."   *Id.* at 479-80, 126 S. Ct. at 1252.

Plaintiff does not allege racial discrimination in the making or enforcement of any contract pertaining to his housing assignment or medical care.   To the extent his allegations suggest that he may view the relationship between him and the CDCR during the period of his incarceration as contractual in nature (*see* First Amended Complaint at 5), this theory has no basis in fact or law.   Allegations that correctional authorities have discriminated against plaintiff in housing assignments and medical care do not give rise to a claim under Section 1981.

Plaintiff's sole allegations pertaining to contractual rights concern an agreement between him and the State with respect to the adjudication of his parole violation.   Plaintiff alleges that, by bringing racially-motivated disciplinary charges against him and placing him in segregation, defendants have breached a written contract with respect to the adjudication of his parole violation pursuant to which plaintiff was to serve only half of six months.   (First Amended Complaint at 20-21.)

Regardless of whether these allegations are sufficient to state a Section 1981 claim, plaintiff cannot pursue it at this time. A prisoner may not seek damages under Section 1983 based on allegations that imply the invalidity of his confinement until he has established, through appropriate state or federal remedies, that his confinement is illegal. Heck v. Humphrey, 512 U.S. 477, 486-87, 114 S. Ct. 2364, 2372 (1994); see also Maes v. Board of Prison Terms, 2006 WL 733472, *2 (N.D. Cal. 2006)(applying Heck to claim that plaintiff was coerced to admit parole violation and agree to ten month sentence). The Heck doctrine also applies to claims arising under other civil rights statutes, such as Section 1981. See Amaker v. Weiner, 179 F.3d 48, 52 (2d Cir. 1999) ("Heck therefore applies with respect not only to plaintiff's § 1983 claim but also to his §§ 1981, 1985(3) and 1986 claims."); Lacy v. County of Maricopa, 2008 WL 312095, *5 (D. Ariz., February 1, 2008) (explaining that Heck analysis is "equally applicable" to a Section 1981 claim). Plaintiff is still in custody and has not alleged that his parole violation has been invalidated. Thus, plaintiff's Section 1981 claim on this basis is Heck-barred.

Accordingly, plaintiff's Section 1981 claims must be dismissed.

## III. PLAINTIFF FAILS TO STATE A SECTION 1983 CLAIM AGAINST GOVERNOR SCHWARZENEGGER, SECRETARY TILTON, OR DIRECTOR WOODFORD.

Plaintiff has asserted claims for damages under Section 1983 against Governor Schwarzenegger, Secretary Tilton, and Director Woodford. (First Amended Complaint at p. 1.)

Section 1983 provides, in pertinent part, that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."   42 U.S.C. § 1983.  As defined by the courts, a person "subjects" another to the deprivation of a constitutional right within the meaning of Section 1983 if he or she does an affirmative act, participates in another's affirmative act, or omits to perform an act which he or she is legally required to do that causes the complained-of deprivation.  <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).  A supervisory official may be liable under Section 1983 only if he or she was personally involved in the constitutional deprivation, or if there was a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  <u>Redman v. County of San Diego</u>, 942 F.2d 1435, 1446-47 (9th Cir. 1991).  Supervisors can be held liable for (a) their own culpable action or inaction in the training, supervision, or control of subordinates; (b) their acquiescence in the constitutional deprivation of which a complaint is made; or (3) for conduct that showed a reckless or callous indifference to the rights of others.  <u>Cunningham v. Gates</u>, 229 F.3d 1271, 1292 (9th Cir. 2000).  Supervisory officials may be liable even without overt personal participation in the offensive act if they implement a policy so deficient that the policy "itself is a repudiation of constitutional rights" and is "the moving force of the constitutional violation."  <u>Redman</u>, 942 F.2d at 1446-47.

Applying the above principles to plaintiff's claims against Governor Schwarzenegger, Secretary Tilton, and Director Woodford, the

Court finds the allegations of the First Amended Complaint insufficient to state a claim against these defendants. Plaintiff's theory of liability is, in essence, that these defendants are liable for the assaults on him, the deficiencies in his medical care, and his wrongful placement in segregation, because these events were caused by their failure to repair and expand California's correctional facilities, provide funds for adequate medical care, and eliminate racial animus on the part of correctional staff.

The Court recognizes that the medical care furnished to prisoners in California has been the subject of much criticism, and the delivery of medical services to California prisoners is currently under the care of a judicially appointed receiver. *See* Plata v. Schwarzenegger, 2005 WL 2932253 (N.D. Cal. 2005). It does not follow, however, that Governor Schwarzenegger and the CDCR defendants *ipso facto* are liable for monetary damages any time because a California prisoner receives inadequate medical care. Even if plaintiff can sufficiently allege that, because of the Plata action and/or otherwise, the supervisory defendants were aware of, and nevertheless failed to rectify, systemwide deficiencies of constitutional magnitude, they will not be liable to plaintiff for damages unless there is a sufficient causal relationship between their wrongful acts or omissions and his injuries. *See* Redman, 942 F.2d at 1446-47. "When a prisoner seeks injunctive or declaratory relief against a myriad of prison personnel responsible for operating a prison, we focus on whether the combined acts or omissions of the state officials responsible for operating the state's penal system created living conditions that violate the eighth amendment." Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988). "[T]he causal link between the

deliberate indifference and the eighth amendment deprivation is broader and more generalized than when the same prisoner seeks damages for the harmful effects of such conditions." *Id.* In the latter case, when a prisoner "seek[s] to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined." *Id.*

Thus, plaintiff cannot assert a claim for damages against Governor Schwarzenegger, Secretary Tilton, and Director Woodford based simply on allegations that they are aware of the problems faced by California's prisons with respect to overcrowding, racial violence, and medical care, and they have failed to rectify them. The connection between these alleged derelictions and plaintiff's injuries is too remote. Plaintiff has not alleged that these defendants adopted policies requiring the assignment of older black inmates to housing in which they would be outnumbered by younger non-black inmates, or that they had any involvement in his placement in segregation or in his medical care. Although plaintiff argues that, given District Judge Henderson's findings in <u>Plata</u>, defendants must have known that he would receive inadequate medical care, this is too attenuated an inference to support liability for damages.[8]  *See* <u>Leer</u>, 844 F.2d at 633.

Plaintiff also attempts to allege personal involvement on the part of the supervisory defendants by alleging that, both before and after

---

[8]     The Court also notes that plaintiff's allegation that Governor Schwarzenegger provided him with medical care "far below the care he would provide for himself" (First Amended Complaint at 3), reveals a fundamental misunderstanding of the requirements of the Eighth Amendment with respect to the medical care provided to inmates.

the assaults on him, he sent them letters notifying them of the problem, and they did not take any steps to protect him. (*See* First Amended Complaint at 9.)  In <u>Jett v. Penner</u>, 439 F.3d 1091, 1098 (9th Cir. 2006), the Ninth Circuit held that an inmate who sent a letter to the prison warden regarding his need to have his fractured thumb set and cast was entitled to an inference that the warden had received the letter and had failed to act.  Plaintiff is not entitled to a similar inference.  First, plaintiff alleges that he sent the letters to the Sacramento County Sheriff's Department, rather than directly to defendants, and there is no reason to assume that the defendants received the letters. (First Amended Complaint at 9.)  Moreover, the connection between Governor Schwarzenegger, Secretary Tilton, and Director Woodford and the day-to-day operation of California's prisons is far more remote than the connection between a prison warden and the day-to-day operation of a facility of which he or she is the warden.

Finally, plaintiff's allegations that Governor Schwarzenegger, Secretary Tilton, and Director Woodford are culpable for accepting custody of him, when they knew that the prison facilities were already overcrowded and unable to provide adequate medical care, do not set forth a cognizable theory of liability. (*See* First Amended Complaint at 5.)  These defendants could not lawfully direct the CDCR to refuse to accept custody of plaintiff.

Accordingly, plaintiff's Section 1983 claims against Governor Schwarzenegger, Secretary Tilton, and Director Woodford must be dismissed.

IV.  **PLAINTIFF FAILS TO STATE A CLAIM AGAINST WARDEN POULOS BASED ON PLAINTIFF'S MEDICAL CARE, PLACEMENT IN SEGREGATION, AND CONDITIONS OF SEGREGATION.**

Plaintiff alleges a Section 1983 claim against Warden Poulos, seeking to hold him liable for the inmate assault on plaintiff, the allegedly inadequate medical care provided to him, and his placement in segregation and the conditions there.  (First Amended Complaint at 241-68.)

A.  **Deliberate Indifference To Safety**

A prison official's deliberate indifference to a substantial risk of serious harm to an inmate's safety violates the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 828, 114 S. Ct. 1970, 1974 (1994); Redman, 942 F.2d at 1443.  The defendant must not only have been aware of facts from which the inference could be drawn that a substantial risk of serious harm existed but also must have actually drawn the inference. Farmer, 511 U.S. at 837, 114 S. Ct. at 1979.

Plaintiff alleges that Warden Poulos was present when plaintiff was placed in a dormitory where the older black inmates were heavily outnumbered by younger Hispanic inmates and that Warden Poulos watched the assault on plaintiff without stopping it.  (First Amended Complaint at 251-52.)  These allegations are sufficient to state an Eighth Amendment claim against Warden Poulos for deliberate indifference to plaintiff's safety.

**B.   Medical Care**

The state must provide medical care to prisoners, because their incarceration has deprived them of the ability to secure medical care for themselves.  Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976); Wakefield v. Thompson, 177 F.3d 1160, 1163 (9th Cir. 1999). Failure to provide medical care violates the Cruel and Unusual Punishment Clause of the Eighth Amendment if it amounts to deliberate indifference to serious medical needs.  Estelle, 429 U.S. at 106, 97 S. Ct. at 292.

A serious medical need exists if failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain.  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997); see Estelle, 429 U.S. at 104, 97 S. Ct. at 291.  Deliberate indifference requires that:  (1) the defendants purposefully ignored or failed to respond to the prisoner's pain or medical need; and (2) their acts or omissions caused the prisoner harm. Jett, 439 F.3d at 1096; McGuckin, 974 F.2d at 1060.  Deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.  Jett, 439 F.3d at 1096; McGuckin, 974 F.2d at 1059.  If medical treatment is delayed rather than denied, the delay generally amounts to deliberate indifference only if it caused further harm.  Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Shapley v. Nevada Bd. of State Prison Comm'rs., 766 F.2d 404, 407 (9th Cir. 1985)(per curiam).

Plaintiff does not allege that Warden Poulos had any involvement in the delay in providing plaintiff with medical care or in the alleged misdiagnosis and failure to treat the tooth protruding into his nasal cavity or in the failure to provide him with medication while he was in segregation.  Although plaintiff alleges that Warden Poulos is generally aware that the medical care provided to plaintiff and other CIM inmates is inadequate, and that Warden Poulos knows that the California prison medical care system has been placed under a receiver, this is not, as explained with respect to the other supervisory defendants, a sufficient basis for holding Warden Poulos liable to plaintiff for damages.  *See* *Leer*, 844 F.2d at 633.

### C.  **Placement in Segregation**

Plaintiff has alleged that he was charged with assault and placed in segregation despite evidence by correctional officers who witnessed the incident that he was the victim.  (First Amended Complaint at 254-55.)  Once again, plaintiff has not alleged that Warden Poulos had any involvement in charging him with a disciplinary violation, placing him in segregation, or failing to promptly release him after the dismissal of the disciplinary charges.  Thus, plaintiff has not alleged a factual basis for asserting this claim against Warden Poulos.  *See* *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)("A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights.").

///

///

///

18

**D.   Conditions Of Segregation**

An Eighth Amendment claim challenging conditions of confinement must satisfy both objective and subjective criteria.  Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324 (1991).  First, the deprivation must be sufficiently serious to implicate the Eighth Amendment.  *Id.* The conditions of a prisoner's confinement amount to cruel and unusual punishment only if he has been deprived of the "minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399 (1981).  Second, prison officials are liable for the deprivation only if they acted with deliberate indifference to a substantial risk of serious harm.  Farmer, 511 U.S. at 828, 114 S. Ct. at 1974.

Prison officials have a duty to ensure that prisoners are provided with adequate shelter, food, clothing, sanitation, medical care, and personal safety.  Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000). In addition, inadequate ventilation may constitute an Eighth Amendment violation if it "undermines the health of inmates and the sanitation of the penitentiary."  Hoptowit v. Spellman, 753 F.2d 779, 784 (9th Cir. 1985).  When a prisoner is deprived of one of these necessities, the circumstances, nature, and duration of the deprivation must be considered in determining whether a constitutional violation has occurred.  Johnson, 217 F.3d at 731.  The more basic the need, the shorter the time it can be withheld.  *Id.*

Plaintiff alleges that during his 120 days in segregation, his cell was very hot and it had insufficient ventilation and no air

conditioning.  Furthermore, the toilet in the cell was nonfunctional and leaked raw sewage during the entire 120-day period, and there were leeches on the floor.  (First Amended Complaint at 260.)  At the pleading level, plaintiff's allegations regarding the lack of sanitation are sufficient to meet the objective prong for an Eighth Amendment violation.  However, plaintiff has not alleged facts showing that Warden Poulos was aware of these conditions and failed to take any steps to alleviate them.  *See* Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996)("[A]n inmate must show that correctional officers were deliberately indifferent to the risk of harm posed by the raw sewage. . . . [N]ot every overflowed toilet in a prison amounts to a constitutional violation.").  Thus, plaintiff has not alleged deliberate indifference on the part of Warden Poulos.  *See* Barren, 152 F.3d at 1194; Leer, 844 F.2d at 633.

**V.    PLAINTIFF FAILS TO STATE A CLAIM AGAINST THE RCRMC AND RADIOLOGY GROUP.**

Plaintiff asserts claims for deliberate indifference to his medical needs against the RCRMC and the Radiology Group.  (First Amended Complaint at 271-72.)

The Court will assume, at the pleading level, that plaintiff has sufficiently alleged that the RCRMC and the Radiology Group acted under color of state law in providing him with medical services.  *See* West v. Atkins, 487 U.S. 42, 54, 108 S. Ct. 2250, 2258 (1988)(private physician under contract with state to provide medical services to inmates was state actor for purposes of section 1983).  However, plaintiff cannot

pursue Section 1983 claims against the RCRMC and the Radiology Group merely because they employed medical personnel who allegedly provided plaintiff with constitutionally inadequate medical care.  To allege a Section 1983 claim against these entities, plaintiff must allege the elements of municipal liability under Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978).  This is so regardless of whether the entity is a municipal body or a private corporation.  See Tater-Alexander v. Amerjan, 2008 WL 961233, *12 (E.D. Cal., April 8, 2008)(reviewing cases and concluding that "the principles of liability articulated in [Monell] apply to private corporations acting under color of law."); Nash v. Lewis, 2007 WL 2027283, *1 (D. Or., July 6, 2007) (analyzing claim against private hospital under Monell).  Under Monell, the RCRMC and the Radiology Group are not liable for constitutional injuries inflicted by their employees unless these injuries were inflicted pursuant to an official policy, custom, or practice of the entity.  Monell, 436 U.S. at 690, 98 S. Ct. at 2035-36.


The First Amended Complaint is devoid of allegations that the medical staff of RCRMC were acting pursuant to official RCRMC policy, custom, or practice when they failed to diagnose and treat the tooth in plaintiff's nasal cavity, or that Dr. Roper was acting pursuant to a Radiology Group policy, custom, or practice when he misread plaintiff's x-rays and misdiagnosed the nature of his problem.  Monell liability under Section 1983 cannot rest on a single, isolated unlawful act by a non-policymaking employee.  Robinson v. City of San Bernardino Police Dept., 992 F. Supp. 1198, 1205 (C.D. Cal. 1998)(dismissing Monell claim against private medical services provider that employed phlebotomist who allegedly performed "sex kit" examination in an unconstitutional

manner); *see* <u>Nadell v. Las Vegas Metropolitan Police Dept.</u>, 268 F.3d 924, 929 (9th Cir. 2001)("A plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident or unconstitutional action by a non-policymaking employee."); <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996)("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.").

Plaintiff's claims against the RCRMC and the Radiology Group, therefore, must be dismissed.

**VI.**   **PLAINTIFF FAILS TO STATE A SECTION 1983 CLAIM AGAINST DRS. YEE AND ROPER.**

Plaintiff asserts claims for deliberate indifference to his medical needs against Dr. Minsley, Dr. Yee, and Dr. Roper.  (First Amended Complaint at 269-73.)

Plaintiff alleges that he was seen by Dr. Yee and Dr. Minsley at the prison hospital.  (First Amended Complaint at 269.)  Dr. Minsley had a "horrid attitude" and refused to take plaintiff's vital signs, order x-rays, or stitch plaintiff's lip injuries.  (*Id.* at 269-70.)  Dr. Minsley told plaintiff that he would stitch his mouth only if he first took an AIDS test.  (*Id.* at 270.)  He also prescribed the wrong medication, which caused plaintiff to lose consciousness.  (*Id.*)

Plaintiff alleges that he told Dr. Minsley and Dr. Yee that there was something "sticking in his nose," but they both said that there was nothing even though, as it turned out, plaintiff had a tooth in his nasal cavity. (*Id.* at 270.) Plaintiff also alleges that, although Drs. Minsley and Yee gave him an appointment to see him a month later, they did not keep it. (*Id.*)

Plaintiff's allegations are insufficient to state an Eighth Amendment claim against Dr. Yee. Plaintiff has alleged only that Dr. Yee made an incorrect diagnosis and prescribed the wrong medication for plaintiff. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106, 97 S. Ct. at 292. An inmate asserting a deliberate indifference claim against his physicians must show that they chose a course of treatment medically unacceptable under the circumstances, and that choice was made with conscious disregard of an excessive risk to the inmate's health. Jackson, 90 F.3d at 332.

However, plaintiff's allegations, read liberally, are sufficient to allege an Eighth Amendment claim against Dr. Minsley. Plaintiff alleges not only that Dr. Minsley misdiagnosed and negligently treated the tooth in plaintiff's nasal cavity, but also that, out of concern for the physician's own safety and rather than for medical reasons related to plaintiff, Dr. Minsley refused to provide treatment for plaintiff's injured lip. The latter allegation, if proven, arguably could implicate the Eighth Amendment. *See* Jackson, 90 F.3d at 332 (defendant physicians

were not entitled to qualified immunity when plaintiff alleged that they denied him a kidney transplant because of personal animosity).

As regards Dr. Roper, plaintiff alleges that Dr. Roper was a radiologist at the Radiology Group who evaluated plaintiff's x-rays and failed to detect the tooth in his nasal cavity. (First Amended Complaint at 273-74.) Once again, plaintiff has alleged no more than negligence or malpractice on the part of Dr. Roper in performing the evaluation of the x-rays. *See* Estelle, 429 U.S. at 106, 97 S. Ct. at 292. The First Amended Complaint is devoid of factual allegations showing that Dr. Roper performed the evaluation with conscious disregard of an excessive risk to plaintiff's health. *See* Jackson, 90 F.3d at 332.

Accordingly, plaintiff's claims against Dr. Yee and Dr. Roper must be dismissed.

VII. **PLAINTIFF FAILS TO STATE AN EQUAL PROTECTION CLAIM**.

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985); *see* Fraley v. Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993). In order to state an equal protection claim, plaintiff "must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent." Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1026 (9th Cir. 1998).

Throughout his First Amended Complaint, plaintiff asserts that no white inmate was ever treated in the manner in which he was treated. (First Amended Complaint, *passim*).  However, the First Amended Complaint is devoid of allegations regarding the housing assignment, medical care, or other treatment of any similarly situated white inmate.  Even a liberal construction of a complaint cannot supply essential elements of a claim that were not pled.  <u>Ivey v. Board of Regents of University of Alaska,</u> 673 F.2d 266, 268 (9th Cir. 1982).  Accordingly, plaintiff fails to state an equal protection claim.

### CONCLUSION

For the foregoing reasons, the First Amended Complaint is dismissed with leave to amend.  If plaintiff wishes to pursue this action, he is granted thirty (30) days from the date of this Memorandum and Order within which to file a Second Amended Complaint that attempts to cure the defects in the First Amended Complaint described herein.  The Second Amended Complaint, if any, shall be complete in itself.  It shall not refer in any manner to the original Complaint or the First Amended Complaint.

Plaintiff is advised that he may *not* add new claims or new defendants without obtaining prior leave of court.  Fed. R. Civ. P. 15(a).

///
///
///
///

**Plaintiff is explicitly cautioned that failure to timely file a Second Amended Complaint, or failure to correct the deficiencies described herein, may result in a recommendation that this action be dismissed pursuant to Fed. R. Civ. P. 41(b).**

DATED: August 26, 2008.

                                        /s/
                                MARGARET A. NAGLE
                        UNITED STATES MAGISTRATE JUDGE